## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| REGGIE N.,[1] ) | |
| ) | No. 21 CV 63 |
| Plaintiff, ) | |
| ) | |
| v. ) | Magistrate Judge Young B. Kim |
| ) | |
| KILOLO KIJAKAZI, Commissioner ) | |
| of Social Security, ) | |
| ) | August 16, 2023 |
| Defendant. ) | |

### MEMORANDUM OPINION and ORDER

Reggie N. seeks supplemental security income ("SSI") asserting that various mental health conditions prevent him from working. He brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying his application for benefits. Before the court are cross motions for summary judgment. For the following reasons, Reggie's motion is denied, and the government's is granted:

### Procedural History

Reggie filed an SSI application in March 2018 alleging disability onset as of January 2014. (Administrative Record ("A.R.") 216-20.) After his application was denied initially and upon reconsideration at the administrative level, (id. at 107-35), he sought and was granted a hearing before an Administrative Law Judge ("ALJ"), (id. at 152-53, 172-77). Reggie appeared at the February 2020 hearing, and he and a

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Reggie's first name and last initial in this opinion to protect his privacy to the extent possible.

vocational expert ("VE") testified. (Id. at 30-88.) The ALJ concluded in March 2020 that Reggie was not disabled. (Id. at 10-29.) The Appeals Council denied Reggie's request for review, (id. at 1-6), making the ALJ's decision the final decision of the Commissioner, *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Reggie then sought judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 7).

## Analysis

Reggie argues that the ALJ failed to properly explain and account for all of his limitations in the residual functional capacity ("RFC") assessment and analyze his subjective symptoms. (See generally R. 17, Pl.'s Mem.; R. 20, Pl.'s Reply.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and substantial evidence supports the decision, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing the evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). But the ALJ must also "provide a 'logical bridge' between the evidence and [her] conclusions," *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021), supplying enough detail to "enable a review of whether the ALJ considered the totality of a claimant's limitations," *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021). Having

considered the arguments and the record, the court concludes that the ALJ has satisfied her obligations in this case.

**B.    Symptom Assessment**

The court first tackles Reggie's argument that the ALJ erred when assessing his subjective symptoms, because a ruling in his favor on this issue necessarily requires a reassessment of his RFC.  When evaluating subjective reports, an ALJ considers: (1) objective medical evidence; (2) daily activities; (3) frequency and intensity of pain or other symptoms; (4) medication, treatment, and other measures to relieve pain or other symptoms; and (5) functional limitations.  *See* SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  Generally, an ALJ's symptom evaluation will not be disturbed if it is based on specific findings and evidence and not "patently wrong."  *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014).

Reggie contends that the ALJ erred when she found him capable of full-time work based on the fact that he never received inpatient psychiatric treatment.  (Pl.'s Mem., R. 17 at 13-14; Pl.'s Reply, R. 20 at 12-13.)  It is true that an individual who does not require inpatient psychiatric hospitalization may still be unable to work because of mental impairment, and it would be wrong to conclude otherwise.  *See Martinez v. Kijakazi*, 71 F.4th 1076, 1083 (7th Cir. 2023) (noting that "a lack of inpatient treatment does not necessarily indicate that a claimant is therefore capable of gainful employment").  But the ALJ reached no such conclusion here.  Indeed, Reggie selectively quotes from the ALJ's decision in his motion, which appropriately

considered Reggie's lack of hospitalization along with other aspects of his treatment, while at the same time assessing numerous non-exertional limitations. For example, the ALJ noted that Reggie: "generally managed his symptoms on medication" from which he "denied persistent side effects"; sometimes had "difficulty maintaining compliance" with his medication and "at times, refused assistance with organizing" them; and only recently started individual therapy. (A.R. 22.) But the ALJ commented that despite having just started therapy and not always taking his medications, Reggie's mental status signs generally remained "stable"—even when under significant stress. (Id. at 20-22 (citing id. at 751-53 (September 2019 psychiatry note reflecting that Reggie had recently lost his godmother and reported hallucinations and poor sleep, but except for presenting as anxious and irritable, his mental status assessment was otherwise normal)).) As such, while the ALJ considered Reggie's lack of hospitalization, her decision was not based solely on this fact. *See Stephen J. v. Kijakazi*, No. 21 CV 301, 2022 WL 3699467, at *6 (S.D. Ind. Aug. 25, 2022) ("Because the ALJ did not discount [claimant's] subjective reports . . . solely because of a lack of psychiatric hospitalization . . . the Court does not find remand appropriate on this issue."); *see also Elizabeth D. v. Saul*, No. 19 CV 6024, 2021 WL 148831, at *13 (N.D. Ill. Jan. 15, 2021) (affirming denial of benefits where ALJ "did not find that the lack of psychiatric hospitalizations demonstrated that [claimant] had no limits on her ability to function or necessarily meant that she could perform full-time work").

Reggie also complains that the ALJ wrongly concluded his symptoms were "generally managed" by medication and improperly considered his lackluster compliance with his medication. (R. 17, Pl.'s Mem. at 13-14; R. 20, Pl.'s Reply at 13-14.) However, when stating that medication "generally managed" Reggie's symptoms, the ALJ did not suggest that it rendered him symptom-free. To the contrary, she acknowledged and discussed Reggie's testimony that medication "sometimes" reduced his auditory hallucinations, not that they disappeared entirely. (A.R. 18, 22.) She also correctly and properly noted that Reggie had never been "observed responding to internal stimuli," was "routinely" described by providers as "alert and fully oriented, with intact cognition and fair concentration," and that he "described experiencing [hallucinations] primarily in his room and at night." (Id. at 20, 22.) The ALJ's conclusion that Reggie's hallucinations would not "significantly interfere with work activity" is supported by substantial evidence. To hold otherwise would require the court to reweigh the evidence, which it cannot do. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) ("We do not reweigh the evidence or substitute our own judgment for . . . the ALJ['s].").

Likewise, the ALJ properly assessed Reggie's lackluster compliance with his medication regimen. An ALJ must consider a claimant's treatment when assessing his credibility but may not hold a claimant's failure to "follow prescribed treatment that might improve symptoms" against him "without considering possible reasons . . . he may not comply . . . consistent with the degree" of his complaints. SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017). Here, the ALJ considered Reggie's reported

reasons for failing to follow his medication regimen strictly. (See, e.g., A.R. 19 (noting Reggie's testimony that he "sometimes stopped his medications" to see if he could "improve on his own" and that he "missed opportunities for medication refills when his primary provider went on medical leave"), id. at 21 (noting Reggie's report to a provider that he had not filled certain prescriptions because of cost issues at current pharmacy, but "expected them to be covered at another pharmacy").) And as discussed, the ALJ correctly noted that although Reggie's medications helped with his symptoms, his mental status signs were largely normal even when off medication. In short, the ALJ treated Reggie's noncompliance appropriately.

Lastly, Reggie argues that the ALJ improperly discounted his symptom allegations as inconsistent with his daily activities and failed to consider the limitations he experiences when performing them. (R. 17, Pl.'s Mem. at 11-13; R. 20, Pl.'s Reply at 10-12.) Daily activities generally must be considered "with care," *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), because a claimant's "ability to struggle through" them "does not mean that she can manage the requirements of a modern workplace," *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). Before an ALJ can hold such activities against a claimant, the ALJ must explain the inconsistencies between his activities and allegations. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (holding that ALJ must "explain the 'inconsistencies' between [a claimant's] activities of daily living . . . complaints of pain, and the medical evidence"). The ALJ also must address any limitations in the claimant's performance of those activities. *See, e.g.*, *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (remanding

6

where ALJ ignored claimant's qualifications "as to *how* he carried out [daily living] activities" (emphasis in original)).

Here, the ALJ did not equate Reggie's activities with the ability to work full time, and she properly explained how those activities affected her assessment of Reggie's allegations. For example, the ALJ acknowledged Reggie's testimony about hallucinations and difficulty interacting with others, but noted inconsistencies between his hearing testimony and reports to providers regarding the same and pointed out that he could shop in stores, prepare simple meals, assist with household chores, and approach strangers for odd jobs. (A.R. 22.) Further, the ALJ compared Reggie's testimony that he struggles with hygiene with medical records in which his providers routinely described him as appropriately dressed and groomed at appointments. (Id. at 17, 19-22.) Reggie may be dissatisfied with the ALJ's conclusions in this regard, but her analysis was proper. *See Green v. Saul*, 781 Fed. Appx. 522, 526 (7th Cir. 2019) ("ALJs are tasked with reviewing the evidence . . . and assessing whether a claimant is exaggerating . . . and reviewing daily-living activities is an important part of that evaluation."); *David C. v. Kijakazi*, No. 20 CV 2798, 2021 WL 5578755, at *4 (N.D. Ill. Nov. 30, 2021) (holding that "ALJ reasonably determined that Plaintiff's subjective symptoms were not fully corroborated," including by noting inconsistencies between her symptom allegations and daily living activities).[2]

---

[2] Reggie notes in his reply brief that the government did "not really acknowledge" other limitations in his daily living activities, including his "need for professional help to organize his medications" and reminders to take those medications, as well as his inability "to properly handle his money." (R. 20, Pl.'s Reply at 11-12.) But none of the jobs the ALJ identified as suitable involve managing or handling money, and the

Even if the ALJ overemphasized Reggie's activities, "[n]ot all of the ALJ's reasons [for discounting a claimant's symptom allegations] must be valid as long as enough of them are." *Halsell v. Astrue*, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) (emphasis in original) (upholding subjective symptom analysis although "ALJ's reasoning [was] imperfect" because ALJ "cited other sound reasons for disbelieving [claimant]"); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) ("Though the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'"). Here, the ALJ offered other valid reasons to support her symptom assessment, including Reggie's conservative treatment and inconsistent and relatively unremarkable evidence from the objective medical record. As such, the ALJ's assessment of Reggie's daily activities does not require reversal.

## B. RFC Assessment

Reggie argues that the ALJ failed to properly explain her RFC analysis and account for all his limitations. (R. 17, Pl.'s Mem. at 7.) An RFC measures the tasks a person can perform given their limitations based on "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). When assessing the RFC, the ALJ must "evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v.*

---

ALJ addressed Reggie's other contentions. (See A.R. 21-22 (noting Reggie's difficulty with medication compliance but pointing out that he refused assistance organizing his medications on several occasions and that even when he had been off of medications for over a month and lost his godmother, he was "anxious and irritable" but his mental status signs were "otherwise normal").)

*Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). Where the ALJ does not rely upon medical opinions, she must "thoroughly discuss[] the medical and other evidence," considering each of the claimant's "impairments and related function deficits," *Nina Joyce H. v. Saul*, No. 18 CV 4913, 2020 WL 212771, at *7 (N.D. Ill. Jan. 14, 2020), and "describe[e] how the evidence supports each [RFC] conclusion," *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011) (citing SSR 96-8p).

Here, the ALJ found that despite severe impairments of bipolar disorder, PTSD, and certain non-severe physical impairments not at issue in this case, Reggie can perform a full range of work at all exertional levels, and:

> can learn, understand, remember, and carry out simple work-related instructions. He can focus on and attend to simple related work [sic] tasks. He can work with the general public in a brief and superficial manner with no more than occasional interactions. He can work with coworkers occasionally but cannot do teamwork or tandem work. He can learn work duties from a supervisor (during introduction of work/ probationary period) and thereafter tolerate occasional supervision following the introduction of tasks. His supervision should exclude . . . over-the-shoulder or intense supervision. He should not work in a fast-paced production work environment or one that is considered high stress but can work with average pace or end of day goals.

(A.R. 18.) The ALJ found that with these limitations, Reggie could "concentrate on the work tasks in two-hour increments throughout a typical workday." (Id.)

Reggie's first complaint is that the ALJ did not explain how he could interact with supervisors "on an unlimited basis" during the probationary period given his difficulty with social interaction. (R. 17, Pl.'s Mem. at 8.) But the supervision the RFC contemplates is inherently limited, as is the work itself. (See R. 19, Govt.'s Resp. at 5 n.2.) Indeed, the RFC restricts Reggie to simple instructions and tasks and no

9

over-the-shoulder or intense supervision, teamwork, or fast-paced production, among other restrictions. (Id.) It requires no leap of logic to deduce that the associated teaching and learning curves are not grueling—a conclusion bolstered by the unskilled nature and specific vocational preparation ("SVP") score for the jobs identified as suitable for Reggie. (See A.R. 24 (listing as suitable the unskilled, SVP "2" occupations of hand packager, industrial cleaner, and inspector); 20 C.F.R. § 404.1568(a) (explaining that "unskilled" work involves "little or no judgment to do simple duties that can be learned on the job in a short period of time"); SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000) (explaining that SVP of "2" out of 10 means job can be learned with "anything beyond short demonstration up to and including 1 month"). The ALJ also pointed to record evidence that despite his allegations, Reggie had been and could be successful in his interactions. (See, e.g., A.R. 16-17, 19, 20, 21 (citing medical records describing Reggie as pleasant, cooperative, polite, friendly, responsive, and engaged), 22 (noting Reggie's testimony that he had approached strangers for odd jobs).) Reggie points to no evidence that the ALJ overlooked, and no opinion calls for greater restrictions than the RFC provides. Moreover, Reggie's providers rated him at most as moderately inhibited in social interaction. (See, e.g., A.R. 410 (September 2017 community support intake assessment noting mild impairment in interpersonal interaction), 412 (February 2018 assessment again noting mild issues with interpersonal interaction), 693 (February 2019 mental status evaluation reflecting "satisfactory" social adjustment), 678 (June 2019 assessment noting moderate impairment in functional status due to being "conflicted, withdrawn,

10

alienated, or otherwise troubled" in his relationships), 680 (July 2019 assessment again rating social impairment as "mild").) There was no error here.

Reggie also complains that the ALJ failed to explain how he could concentrate in two-hour increments "without any limitation," and that this assessment runs counter to the state agency psychologists' opinions that he was "moderately limited" in his ability to "maintain attention and concentration for extended periods of time." (R. 17, Pl.'s Mem. at 10 (citing A.R. 115, 131).) Reggie points out that "extended period" for these purposes means "the approximately 2-hour segments between arrival and first break, lunch, second break, and departure." (Id. at 9-10 (quoting SSA's Program Operations Manual System ("POMS"), POMS DI 25020.010(B)(2)), available at https://secure.ssa.gov/poms.nsf/lnx/0425020010 (last visited Aug. 11, 2023)).) But this moderate limitation does not mean the consultants felt Reggie was incapable of full-time work. To the contrary, the very same consultants concluded that Reggie could "complete a normal workday and workweek without interruptions from psychologically based symptoms," and, except for moderate limitations in this area and in carrying out detailed instructions, he was otherwise not significantly limited in concentration, persistence, or pace. (A.R. 115, 131.) Notably, Reggie himself testified that he could "probably" work a half day and that he is "good for a couple of hours" of concentration "without having to take a break and just get away from it all." (Id. at 57.)

As such, the court finds no contradiction between the consultants' moderate limitation and the RFC analysis. Although the ALJ reasonably questioned the extent

11

of the hallucinations Reggie blames for his concentration issues—discussed further below—(id. at 40, 45), she nevertheless assigned an RFC that includes significant limits on the types of instruction, tasks, pace, stress level, supervision, and interaction that Reggie can handle on the job, (id. at 18). Reggie complains that those limits are inadequate but offers no specific limitations of his own, let alone evidence to support more severe restrictions. *See Weaver v. Berryhill*, 746 Fed. Appx. 574, 579 (7th Cir. 2018) (holding that claimant must "establish not just the existence of [his] conditions, but . . . that they support specific limitations affecting [his] capacity to work"). Accordingly, remand is not warranted on this ground either.

Finally, Reggie contends that the ALJ did not adequately consider his hallucinations when formulating the RFC and mischaracterized the record. (R. 17, Pl.'s Mem. at 11.) Reggie says the ALJ should have addressed his hearing testimony that he heard voices at any time of the day, every day, instead of merely noting that Reggie "has described experiencing [hallucinations] primarily in his room and at night, such that they would not be expected to significantly interfere with work activity." (Id. (quoting A.R. 22, 65).) Reggie also says that by noting his medications made the hallucinations "quieter" and "less frequent," the ALJ improperly suggested that those hallucinations disappeared entirely when they did not. (Id.)

The court is satisfied with the ALJ's assessment of the hallucination evidence. Contrary to Reggie's representations, the ALJ acknowledged Reggie's testimony that he heard his father's voice with regularity and had trouble tuning it out, and that medication did not eliminate the voices entirely. (A.R. 18.) But the ALJ pointed out

12

that Reggie told his providers on several occasions that either his hallucinations occurred at night and/or in his room only, or that he was not experiencing them at all. (See id. at 20-21 (citing, e.g., id. at 579, 636, 778-79).) The ALJ also referenced a June 2018 note by Reggie's psychiatrist that his hallucinations were "much more congruent with flashbacks than a psychotic issue," (id. at 20 (citing id. at 625)), and pointed out that he had never "been observed responding to internal stimuli" and "routinely presented at appointments as alert and fully oriented" with "intact cognition and fair concentration," (id.). The ALJ appropriately contrasted this evidence with Reggie's hearing testimony, while still assessing a number of non-exertional limitations. *See Butler v. Berryhill*, No. 17 CV 662, 2018 WL 4140887, at *2 (N.D. Ind. Aug. 30, 2018) (holding that ALJ properly discounted the severity of alleged hallucinations by noting that claimant "denied hallucinations on several occasions" and "no clinician had ever noted responses to internal stimuli"); *see also Martinez v. Astrue*, No. 09 CV 3051, 2010 WL 1292491, at *8 (N.D. Ill. March 29, 2010) (noting that ALJ did not err in declining to assess limitations for hallucinations where claimant's provider opined that he could still engage in simple, repetitive, routine tasks and repeatedly found him "well dressed, well groomed and cooperative, with intact judgment and good insight"). At bottom, Reggie fails to point to any favorable evidence that the ALJ ignored, and the court cannot reweigh the evidence. *See Burmester*, 920 F.3d at 510 (holding that courts must not "reweigh evidence . . . or substitute [its] judgment for that of the Commissioner").

## Conclusion

For the foregoing reasons, Reggie's motion for summary judgment is denied, the government's is granted, and the Commissioner's decision is affirmed.

ENTER:

**Young B. Kim**
**United States Magistrate Judge**